**RECOMMENDED FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON**

**CIVIL ACTION NO. 05-48-DLB**

**THE ESTATE OF STEVEN THOMAS**                           **PLAINTIFFS**
**BIGHAM by TINA D. BIGHAM,**
**Administratrix, et al.**

**vs.**                  **MEMORANDUM OPINION & ORDER**

**DAIMLERCHRYSLER CORPORATION**                      **DEFENDANT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## I.    INTRODUCTION

Plaintiffs, Tina D. Bigham, individually and as administratrix for the estate of Steven Thomas Bigham, bring this motor vehicle product liability and wrongful death action against Defendant, DaimlerChrysler Corporation. Plaintiffs allege, in general terms, negligence by Defendant in the design, warning, and marketing of the occupant restraint system for the Jeep Wrangler, which includes components of the roll cage.[1] Plaintiffs are seeking compensatory and/or punitive damages in the approximate amount of $5,500,000.

This matter is presently before the Court upon Defendant's Motion for Summary Judgment on All of Plaintiffs' Claims (Doc. # 21) and Motion for Summary Judgment on

---

[1] Because of the nature of the legal framework at work in this case, Plaintiffs' failure to warn and negligence in marketing claims are effectively subsumed, analytically speaking, by the overarching design defect claim. This reality is reflected in both parties' pleadings.

Punitive Damages (Doc. # 23).[2]  Plaintiffs have filed a Response to both motions (Docs. # 26, 27) to which Defendant filed Replies (Doc. # 28, 29).  Therefore, the motions are now ripe for the Court's review.

## II.   FACTUAL BACKGROUND

### A.   The Accident

On November 15, 2004, while driving along Interstate 75 in Grant County, Kentucky, Steven Bigham (the "deceased") was killed in a two-car collision involving his 1999 Jeep Wrangler and a 2002 Toyota Camry driven by Jerry Stamper ("Stamper").  The basic details of the accident, outside of the matters in controversy, are not in dispute.

On the day in question, Stamper was traveling in excess of 100 miles per hour when he struck the deceased's vehicle, which was traveling near or at the speed limit of 65 miles per hour.  When Stamper's vehicle collided with the Jeep in the rear corner of the driver's side, the impact sent the Jeep into a clockwise spin.  As the deceased's vehicle left the roadway from the force of the impact and resulting spin, a rollover was initiated on the driver's side.  The Jeep proceeded to flip at least three to four times as it traveled off of the shoulder, down a grass embankment, and eventually came to rest upright in a rock-laden drainage ditch running alongside the Interstate.[3]

---

[2] Defendant has also filed a Motion for Hearing on both the "all claims" and "punitive damages" summary judgment motions (Docs. # 24, 25).

[3] In his report, Plaintiffs' expert, Gary Derian, inexplicably reveals that "[i]nspection of the accident scene photographs revealed a cleared land space free of spear-like objects required to cause Bigham's specific skull fractures and puncture wounds."  Regardless, Plaintiffs do not dispute that the deceased's Jeep rolled through and came to rest on top of the rock ditch.  In fact, Plaintiffs' own expert, Ben Wilson, acknowledges the path of the Jeep over the rocks:

Q:    You don't dispute that Mr. Bigham's Jeep traveled over the rock ditch at some point?
A:    I do not.

Upon arrival, police and paramedics found the Jeep approximately 355 feet away from the initial point of impact with Stamper's vehicle, and approximately 160 feet from the point where the deceased's vehicle began to flip.  It was later determined, based on these and other calculations, that the deceased was traveling around 45 miles per hour when the rollovers commenced.  Despite the incredible amount of energy exerted during the crash and the subsequent rollovers, the deceased was found upright in his Jeep with his seatbelt still engaged and the doors closed.  Unfortunately, however, Mr. Bigham did not survive the crash and was pronounced dead at the scene.

**B.    Vehicle Damage**

Because of the nature of the rollover accident, which Defendant's expert described as a "rare and severe event," the extent of the damage to the deceased's vehicle was substantial.[4]  Although it is unnecessary to detail the full extent of the wreckage, there are several points of damage to the Jeep that are relevant to the instant action.

First, it is uncontested that what is referred to as the safety bar or the sport bar – hereinafter the "lateral roll bar" – fractured at some unknown point during the accident. These lateral roll bars effectively act as part of the car's roof frame, or in this case part of the vehicle's roll cage because the Jeep had a soft top only (not engaged at the time of the

---

Q:    We've covered that.  Do you know what position the Jeep would have been in when
       it traveled over the rocks?
A:    Most of the weight of the vehicle was on the hood and the roll cage area.
Q:    So would that indicate to you the vehicle was upside down?
A:    Yes.  Which is evidenced by the deep scratches on the hood.

[4] While Plaintiffs' expert oddly suggests that "the speed of Bigham's Jeep and the manner in which it rolled are not unusual or unique" and that, therefore, "Chrysler engineers would be expected to provide protection to occupants in such a crash," there is data suggesting that "less than 0.5% of all passenger vehicles involved in rollovers experience three or more complete rolls."

-3-

accident).  The two lateral roll bars run parallel to (and above) the doors on both sides of

the Jeep and extend approximately two feet laterally from the tops of the windshield frame

back to the primary roll bar, which runs horizontally behind the driver and passenger seats.

In this case, the lateral roll bar on the driver's side split completely in half exposing a very

jagged metal hazard to the driver.  The split occurred near the middle of the lateral roll bar

where a vertical weather stripping piece was bolted to the bar.  It is believed that the bar

broke at that specific point because it was the weakest point on the bar due to the bolt

holes used to attach the weather strip.  There is nothing in the record speaking to whether

the bar would have broke without the bolt holes in question, but the record shows that the

passenger side lateral roll bar – containing identical bolt holes – did remain intact during

the rollovers.

Second, it is similarly uncontested that the floor board, or possibly the seat plate or

bracket attaching the seat to the floor of the car, failed at the back-inward point of the seat.

The result of this failure was the raising of the seat anywhere from 4-6 inches vertically.

The pictures depict that because the seat or floor board deformed in only one area, the

seat was actually tilted up and to the left from the driver's perspective, which could have

potentially allowed the driver's head to escape the confines of the Jeep (i.e., the boundary

created by the roll cage) during the accident both vertically above the roof line and

horizontally outside the driver's side window area where the lateral roll bar was located.

There is also some evidence that the seat back broke during the accident – i.e., the

mechanism that permits the seat to decline failed – which would have further increased the

driver's freedom of movement.  However, the record does not demonstrate that the seat

back necessarily broke because it was possible that the deceased had the seat in a decline

-4-

position and the pictures, which were taken after the car was removed from the scene, do not evidence any noticeable decline of the driver's side seat relative to that of the passenger side seat.  Regardless, the extra freedom of movement caused by the floor or seat plate deformation, as well as the alleged seat back displacement, was not able to be compensated for by the seat belt because the anchor point for the belt was on the roll bar column, which was already in front of a normally-positioned driver.[5]   In other words, because the deceased would have been behind the anchor point for the seat belt during the rollovers, his body had a significant degree of freedom to move around in the passenger compartment relative to what would occur under normal operating conditions.

**C.    Injuries**

The official cause of death in this case was "massive blunt force injuries, largely to the head."  Specifically, the deceased suffered multiple, severe blows to his head during the accident, including large lacerations and gouges to the parietal area of the head (top and back), above the nose, the right jaw, and the left side of the neck.  The largest of these injuries, the parietal and lower forehead areas, actually resulted in two holes in the skull and the loss of brain matter.  Although the extent of the injuries themselves are not in dispute, there is a dispute surrounding the instrumentality of death.

---

[5] Plaintiffs also claim that the seat belt itself may have failed at the anchor point on the vertical pillar for the primary roll bar, as well as at other points such as the seatbelt arm on the inboard side of the seat where the buckle is inserted.  However, the record provided does not appear to adequately support the claims on these points and is hampered by Plaintiffs failure to make any citations to the record, which is a common theme throughout Plaintiffs' pleadings.

Plaintiffs allege the fatal blows were dealt by the broken end of the lateral roll bar,[6] while Defendant asserts that the injuries were caused by the deceased impacting rocks when the Jeep flipped over into the rock-laden ditch alongside the highway.[7]  The experts retained by both parties have conflicting viewpoints consistent with both the bar and rock theories.  The medical examiner did not opine as to what object caused the death, only that the ultimate cause of the deceased's death was massive blunt force trauma to the head.

In addition to the fatal head injuries, the deceased suffered a myriad of other injuries that, although not individually life threatening, were potentially fatal when taken together.[8]

_____

[6] Plaintiffs even assert, in response to Defendant pointing out the lack of any medical expert in the case, that "looking at the autopsy photos it is relatively easy to see the pipe impact trail along Steven Bigham's head, then jaw, then chest" and that "this is squarely within the capabilities of a lay juror to comprehend."  While it may be clear that some injuries were potentially caused by the broken bar, it is not clear that all of the potentially fatal head injuries were the result of the broken bar, if any.  Furthermore, a juror could not be expected to look at the photographs and simply conclude that the bar is the obvious culprit.

[7] The rock theory is arguably supported by evidence of rocks at the accident scene that were covered with large amounts of blood and brain matter, although blood and brain matter were also found strewn across the entirety of the accident scene, as well as on the driver's seat, because of the force of the rollovers.

[8] In a brief exchange during his deposition, Dr. Charles Stephens ("Dr. Stephens"), who performed the autopsy on the deceased, concluded that the aggregation of the non-head injuries could have been fatal:

> Q:   Which injuries, other than the head injuries, do you view as being serious enough to have caused death?
> A:   Well, the combination, the total combination are significant.  In other words, if you have your clavicles broken, your sternum fractured, your ribs fractured, your intercostal muscles lacerated, your lung contused and your spleen lacerated, you are in trouble.  The whole cluster of injuries puts you at a significant disadvantage.
>
> * * *
>
> Q:   But none of those injuries even combined one with the other would have been fatal, correct?
> A:   I don't think you could say that.
> Q.   Okay.  Why not?
> A:   It assumes an omnipotence that I don't have, and I doubt that you have.  In other words, you're sitting there looking at a guy that's taken some licks, and saying well,

-6-

These injuries include, *inter alia*: (1) fractures of the nasal septum, maxilla, mandible, right and left clavicle, right shoulder, left humerus, and left ribs; (2) lacerations of the intercostal muscles, spleen capsule, and the chest cavity; and (3) contusions to the neck, chest, pectorals, arms, abdomen, upper thigh, hand, and massive lung contusion.  Some of these injuries were likely caused by the broken lateral roll bar and Defendant doesn't appear to contest this point.  Rather, Defendant believes that either the fatal head blows were not the result of the broken bar or that, alternatively, the contact with the metal bar took place after the fatal blow had already been dealt when the deceased impacted the rocks.

Although the various experts disagree as to the likelihood that Mr. Bigham would have survived if not for the fatal head injuries, no expert has been able to state definitively, or even with a reasonable degree of medical certainty, that the deceased would have survived absent the head injuries in question.  To the contrary, Dr. Stephens stated in his deposition that "Mr. Bigham's head injury was far worse than anything else he had, but the other injuries are significant and could have been a cause of death in and of themselves."  Despite the conflicting reports regarding the instrumentality of the fatal head injuries and the seriousness and contribution of the other injuries, it is undisputed that the massive head lacerations and impact cavities were ultimately the causes of death, and that the deceased most likely died the moment they occurred during the accident.

---

they're not fatal.  I'm saying you can't be sure about that, because I've seen people roll into my room in the hospital with less injuries deader than a doornail.

## III.   ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the movant has met this initial burden, the non-movant cannot rest on its pleadings, but must show that there is a genuine issue for trial. *See id.* at 324. A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). If a reasonable jury could not return a verdict for the nonmoving party on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). Finally, and perhaps of great import in this case, the Court does *not* have the duty "to search the entire record to establish that there is a bereft of a genuine issue of material fact." *Poss v. Morris (In re Morris)*, 260 F.3d 654, 665 (6th Cir. 2001).

### B.   Product Liability Background

In this diversity action, Kentucky law governs. Plaintiffs allege defective design by Defendant in the manufacturing of the Jeep Wrangler in question. In Kentucky, to impose liability upon a manufacturer for an allegedly defective product, it must be shown that the

product is "in a defective condition unreasonably dangerous to the user or consumer." *Morales v. American Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998) (quoting *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984)). In cases of defective design, the difference between strict liability and negligence "is of no practical significance so far as the standard of conduct required of the defendant is concerned. In either event the standard required is reasonable care." *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69-70 (Ky. Ct. App. 1973).

Because the standard in design defect cases is effectively strict liability, which rests on a foundation of reasonableness, a product is only considered "defective" when "it is made according to an unreasonably dangerous design." *Id.* at 69. In other words, in determining whether Defendant's design in this case was defective, "the fact finder . . . must decide whether the manufacturer that placed in commerce the product made according to an intended design acted prudently, i.e., was the design a defective condition which was unreasonably dangerous" to the consumer Plaintiff? *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980). Under this analysis, "[t]he manufacturer is presumed to know the qualities and characteristics, and the actual condition, of his product at the time he sells it." *McCullough*, 676 S.W.2d at 780. As for causation, Plaintiffs have the burden of establishing that Defendant's allegedly defective design was the proximate cause of the alleged wrongful death, which "is defined by the substantial factor test: was [Defendant's] conduct a substantial factor in bringing about [Plaintiffs'] harm?" *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995).

Although the burden is already on Plaintiffs to prove the wrongful death/product liability action by a preponderance of the evidence, Kentucky law has a statutory

presumption that has the potential to reinforce, and perhaps strengthen in some cases, this burden on Plaintiffs.  Under K.R.S. § 411.310(2), "[i]n any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the product was not defective if the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured."  Plaintiffs effectively concede that, because Defendant's manufacturing of the Jeep Wrangler in question was by all indications compliant with federal safety standards, Defendant is afforded this rebuttable statutory presumption.  However, Plaintiffs assert that they have overcome this presumption through evidence of a design defect.

While it appears from the statements of both parties, as well as from the record, that the Defendant is indeed entitled to the statutory presumption in this case, the case law is unclear as to the actual effect of the presumption.  Given that the presumption is only rebutted when Plaintiffs show proof of a defect by a preponderance of the evidence, the presumption would appear to "do nothing more than codify what the law has always been." *Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924, 928 (Ky. Ct. App. 1988).  Consequently, Plaintiff "must still prove by a preponderance of the evidence that the product in question is defective."  *Id.*

Either way, Kentucky law has been consistent in insisting that "proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or seller's duty as to the design of the product."  *Jones*, 502 S.W.2d at 70.  Based on this proposition, the unique nature of claims similar to the instant action has given rise to a

-10-

specialized niche in the law known as the "crashworthiness" doctrine, which now governs Plaintiffs' claims under Kentucky law.  *See generally Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35 (Ky. 2004).

## C.    Crashworthiness Doctrine

In this case, Plaintiffs do not contend that any defect caused the accident.  Rather, Plaintiffs claim that the deceased would not have died – i.e., would not have received the fatal head injuries – if not for the alleged defects.   Such allegations are generally characterized as enhanced injury claims because Plaintiffs are not suggesting that Defendant is responsible for the accident itself, nor could they.  Rather, Plaintiff is merely suggesting that certain injuries, which caused the death of Mr. Bigham, occurred above and beyond what should have befallen an individual from an accident of this type absent the alleged design defects in the manufacturing of the Jeep.

Under Kentucky law, such actions are legally classified as "crashworthiness" claims because, as the name suggests, the crux of these product liability cases is determining whether the design of a vehicle was defective in its alleged inability to withstand an accident and prevent injuries that would not have otherwise occurred.  *See Gregory*, 136 S.W.3d at 41-42; *O'Bryan v. Volkswagen of America*, No. 93-5292, 1994 U.S. App. LEXIS 31348, at *12-15 (6th Cir. Nov. 1, 1994) (unpublished); *Gray v. General Motors Corp.*, 133 F. Supp. 2d 530, 534-36 (E.D. Ky. 2001); *McCoy v. General Motors Corp.*, 47 F. Supp. 2d 838, 839-41 (E.D. Ky. 1998); *Caudill v. Toyota Motor Corp.*, No. 04-333-DLB, 2005 U.S. Dist. LEXIS 29395, at *8-11 (E.D. Ky. Nov. 23, 2005) (unreported).  "The claim, in essence, is that the design of the vehicle failed to reasonably protect the occupant in a collision." *Gregory*, 136 S.W.3d at 41.

To establish a prima facie case in a crashworthiness action, Plaintiffs must demonstrate: "(1) an alternative, safer design, practical under the circumstances; (2) proof of what injuries, if any, would have resulted had the alternative, safer design been used; and (3) some method of establishing the extent of enhanced injuries attributable to the defective design." *Id.*; *see also McCoy*, 47 F. Supp. 2d at 839 (quoting *Caiazzo v. Volkswagenwerk A. G.*, 647 F.2d 241, 250 (2d Cir. 1981). Plaintiffs' action must fail, even at the summary judgment stage, unless sufficient evidence is set forth to meet each prong of the prima facie case or to at least create a genuine issue for trial. *See McCoy*, 47 F. Supp. 2d at 840-41 (granting summary judgment for defendant where plaintiff failed to establish both an alternative design and causation); *Caudill*, 2005 U.S. Dist. LEXIS 29395, at *10-11 (same). To this end, the Court need not comb through the entire record in search for a genuine issue for trial where such an issue is absent from the face of the parties' pleadings. *See Morris*, 260 F.3d at 665.

### 1.    First Prong: Alternative Design

The first step in constructing a prima facie crashworthiness claim is to identify an alternative design that would have cured the alleged defect. Plaintiffs must demonstrate something beyond a conclusion that it was "theoretically probable that a different design would have been feasible and would have prevented [the] injury." *Ingersoll-Rand*, 775 S.W.2d at 929. To that effect, the onus is on Plaintiffs to provide expert testimony setting forth "competent evidence of some practicable, feasible, safer, alternative design." *Gray*, 133 F. Supp 2d at 535 (quoting *O'Bryan*, 1994 U.S. App. LEXIS 31348, at *13). Plaintiffs have not even approached the level of proof required to survive summary judgment on this first prong, let alone establish a prima facie case.

-12-

Notwithstanding Plaintiffs' assertion that they have discussed "the known and readily available alternative designs" in their pleadings, they have done no such thing. Although Plaintiffs' experts do briefly allude to possible alternative designs in their expert reports and deposition testimony, Plaintiffs never once reference the language or even identify the suggestions of their experts. Nevertheless, the Court believes it is important to detail some of the evidence on this point in order to demonstrate the overall insufficiency of the record as to the proof of an alternative design. Accordingly, the following excerpts, which Plaintiffs fail to cite, are taken from both deposition testimony and expert reports, and represent the large majority, if not all, of the evidence in the record on available alternative designs:

> The floor in the region of the seat mount is flat with no reinforcing or stiffening ribs. Such reinforcement would have strengthened the floor and prevented the seat belt from loosening and failing to protect Bigham.
>
> * * *
>
> A redesigned seat belt attachment would have provided the strength and stiffness required to protect Bigham in this rollover crash. Such strong and stiff seat belt attachments can be designed and manufactured at no significant added cost to Chrysler and would not detract from the use and enjoyment of the vehicle.
>
> * * *
>
> Other means of mounting the side window seals are available to Chrysler engineers. A tab could have been welded to the tube to mount the window frame. A strap or clamp could have been attached around the tube without penetrating the walls of the tube. Either solution is easy to implement and would not detract from the form and function of the Jeep.

(Expert Engineers' Report by Robson Forensic, Inc.'s, p. 3) (authored by Plaintiffs' experts Gary Derian and Mari Truman).

> *(referencing the seat belt attachment)*
> Q:   Do you have an alternative design for this particular component?
> A:   *I don't have one right now*, but there are alternate designs. For instance, it can be mounted to the floor. It could be mounted to preferably a vertical section of the floor which is stiff in the up-and-

-13-

down direction.  It could be mounted in a better way to the seat frame.
There's lots of ways you can do it.

* * *

*(referencing the seat and floor deformation)*

Q:    Have you mocked up any alternative design to determine that some
       other design would have prevented this force moving the seat - - or,
       the floor pan up?

A:    Well, it's a simple engineering exercise to design a floor to resist an
       upward motion, upward force.  *I haven't mocked up, or built anything,
       or crash tested a Jeep*, but if Chrysler had wanted a stiffer floor they
       could have easily have done it.  There's nothing in the design of this
       Jeep that prevents them, it doesn't limit the use of the Jeep, or the
       functionality of the Jeep.  There's no economic problem, you know, it
       won't raise the cost of the Jeep in order to make this floor stronger or
       stiffer in an upward direction.

Q:    Well, physically, how would that be done, stronger gauge steel, more
       layers, more of these ribs?  I mean, what is it you're proposing or
       suggesting?

A:    *I mean, I haven't worked out a design* - -

Q:    All right.

A:    - - you know, and considered the alternative, but this is not a difficult
       problem.  I think the easiest way would be to use the side of the drive
       shaft tunnel, because . . . (goes on to discuss further details)

* * *

Q:    Have you looked at other peer vehicles to the Jeep Wrangler to
       determine how their floor pans are designed and reinforced?

A:    I have not.  I mean, I'm familiar with many ways in which floor
       reinforcements can be done and are done.

* * *

*(referencing the floor pan)*

Q:    But you've not come up with an alternative design of how this floor
       pan could have been designed with this attachment to keep that from
       happening is that fair?

A:    *I have not worked on a design*, but as we have discussed here
       already today, there are ways in which this could be made much stiffer
       without impacting the utility or the cost of the vehicle.

Q:    And is that just your assumption, it would not affect the cost, or what
       basis do you have for that?

A:    Well, I could design it using no additional components and using
       components that require no additional stamping phases.  You know,
       some pieces you can make in one press, some pieces you need two,

-14-

or three, or five, or whatever, and I can design a reinforcement that is stiff in the vertical direction for the same cost as the existing parts.

Q:    But you've not done that?

A:    *I have not done that.*

\* \* \*

*(referencing the lateral roll bar and attaching window frame)*

Q:    *Have you mocked up any alternative design* to attach the window frame to this component without the need of attaching bolts through it?

A:    *No.*

\* \* \*

Q:    Okay.  You mention a strap or a clamp to attach the - - around the tube without penetrating the walls.  Again, that - - that is to avoid the hold for the mounting bolt?

A:    Correct.

Q:    Okay.  *But you've not developed the strap, or the clamp, or done anything to show an alternative measure?*

A:    *That's right.*

(Depo. of Gary Derian, pp. 94-95, 118-20, 122-23, 139-40) (emphasis added) (Plaintiffs' expert; engineer; no medical training).

Q:    What kind of alternative design would you envision for that seat belt stalk floor pan connection?

A:    I would - - I would see stronger metal.  Something that is going to absorb more energy before it buckles and bends.

Q:    How much thicker metal would you require?

A:    I'm not a metallurgist, so I don't know the shear strength of metal and how it bends, but certainly something that's going to absorb a lot more of that energy.

Q:    *Have you done any testing to determine whether a different thickness of metal would have secured this seat belt stalk in a '99 Wrangler?*

A:    *I have not.*

\* \* \*

Q:    Have you done any testing on an alternative design for seats in '99 Jeep Wranglers?

A:    No.

Q:    Have you done any testing of any kind of alternative seating in any vehicle?

A:    I have not.

Q:    Do you intend to do such testing?

A:    I do not.

(Depo. of Ben Wilson, pp. 168, 177) (emphasis added) (Plaintiffs' expert; police officer; not an expert in engineering, manufacturing, design, etc.; no degree or training in engineering; not a medical doctor).

As is evident from this testimony, even though Plaintiffs' experts discuss the possibility of alternative designs and ideas, the extent to which an alternative design has been formally identified is not ascertainable. Despite Defendant's conspicuous efforts to solicit some form of an alternative design, Plaintiffs' experts repeatedly state during deposition testimony that no testing has been conducted on the allegedly defective components or on any possible alternative designs.

Perhaps most telling, however, is Plaintiffs' complete failure to specifically identify or reference any alternative design by name or description anywhere within its Response. The closest Plaintiffs get to addressing a specific alternative is a reference to their crash analysis expert, Gary Derian, stating:

> Derian is critical of the roll cage and safety bar, sport bar, seat back, seatbelt tang, and seatbelt anchor points. This list included not only the found defects, but also the means by which DaimlerChrysler could have improved their design, thereby eliminating the reckless danger of their carelessly designed parts. All could have been implemented easily with little or no additional cost to DaimlerChrysler.

With respect to satisfying the alternative design prong, Plaintiffs are under the mistaken belief that the mere mention that alternative possibilities exist is sufficient. This is simply not the case. Plaintiffs must show "something more than that it was 'theoretically probable that a different design would have been feasible.'" *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996) (quoting *Ingersoll-Rand*, 775 S.W.2d at 929). Even "proof that technology existed, which if implemented would feasibly have avoided a dangerous

-16-

condition, does not alone establish a defect." *Brock*, 94 F.3d at 224 (quoting *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 336 (4th Cir. 1991) (interpreting Kentucky law)).

It is well-settled that Plaintiffs are required, by way of expert testimony, to provide proof of an alternative design through "competent evidence" that there was available to Defendant a "practicable, feasible, safer, alternative design" at the time of manufacturing. *See Gray*, 133 F. Supp. 2d at 535. It is essential in crashworthiness claims to put forth alternative designs that can be tested and scrutinized because the standard is not whether a different design would have prevented the injury, but instead whether the chosen design was indeed defective, which requires substantiated proof of an alternative design. *See Jones*, 502 S.W.2d at 70-71 ("Proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach...as to the design of the product."). Not only have Plaintiffs failed to offer such evidence, but their failure to even formally identify at least one design alternative prevents any form of effective rebuttal by Defendant.

Accordingly, as a threshold matter, the lack of evidence establishing an alternative design proves fatal to Plaintiffs' claims. This dearth of evidence notwithstanding, the Court will address the remaining prongs of Plaintiffs' crashworthiness claim.

## 2.    Second Prong: Alternative Injuries

The second prong of the crashworthiness doctrine requires Plaintiffs to demonstrate proof of what injuries, if any, would have resulted had the proposed alternative design been utilized.   At the outset, Plaintiffs cannot satisfy this prong because Plaintiffs have not specifically identified an alternative design upon which opinions of alternative injuries could be based.  Although Plaintiffs assert that the "injury portion of the discussion is really the most elemental," it is extremely difficult, if not impossible, to proceed to the injury discussion under the crashworthiness framework without first presenting a cognizable alternative design capable of at least minimal vetting.

Furthermore, even assuming *arguendo* that the random enumeration of possible alternatives by some of Plaintiffs' experts could conceivably constitute "competent evidence of some practicable, feasible, safer, alternative design," Plaintiffs still fail to provide any expert *medical* testimony addressing what injuries would have been sustained by the deceased had any of the theoretical designs been utilized.  Plaintiffs' own expert, Ben Wilson, indicates that there is an apparent absence of any research surrounding alternative injuries in this case:

> Q:    Do you know of any studies that would indicate what kind of injuries
>        Mr. Bigham would have received if there had been a different floor
>        pan, a thicker floor pan?
> A:    Only what I could opine myself . . .

(Depo. of Ben Wilson, p. 169).

In addressing the alternate injuries in their pleadings, Plaintiffs' statements are largely focused not on what injuries would have been sustained if alternative designs would have been used, but rather what injuries would have been sustained absent the allegedly

defective design by Defendant.  In other words, Plaintiffs discuss third prong causation instead of addressing second prong alternative injuries.  Whether this was the result of misguided analysis, or simply a lack of medical evidence, arguing that the fatal injuries would not have occurred absent the alleged defects is largely inapposite to the determination of what injuries would have been sustained had an alternative design been used.

Plaintiffs also argue that it is difficult to address alternative injuries – that is, injuries absent the allegedly defective restraint and roll cage system – because the entire restraint system coupled with the frame design of the Jeep was allegedly defective and, therefore, the deceased would have been seriously injured during the rollovers regardless.  Whether or not there is any merit to Plaintiffs' claim of a defective frame and "three-point" restraint design is irrelevant because Plaintiffs do not formally rely on this alleged defect for purposes of the wrongful death action before the Court.[9]  As explicitly stated by Plaintiffs: "Plaintiff maintains the sole reason for the gouging fatal injuries inflicted by the broken pipe are the direct result of a defective sports bar and a defective restraint system," undoubtedly referring to the individual defects alleged throughout Plaintiffs' pleadings – *to wit*, the floor pan, seat back, seat belt anchor, etc.  Even if this additional defect is considered for argument's sake, Plaintiffs still fail to offer any medical evidence as to the likely injuries had

---

[9] Plaintiffs rely upon various government studies and independent reports concerning the alleged defective "three-point" restraint system that, according to Plaintiffs, allows a normally positioned occupant to escape the confines of the Jeep's roll cage during a rollover.  Even if the information provided were relevant to the Court's review, which it is not, it is unreliable hearsay. The reports/studies have not been offered as evidence by Plaintiffs, they are not even attached to Plaintiffs' Response, and the authors have not been retained as experts.

the alleged defects been remedied by an alternative design.  Consequently, Plaintiffs cannot prevail on the second crashworthiness prong.

### 3.    Third Prong:  Causation

The final requirement that Plaintiffs must satisfy to establish a prima facie crashworthiness case is to demonstrate the extent of the injuries attributable to the allegedly defective design – i.e., causation.  This prong is necessary in every product liability action, as causation is crucial to establishing liability.  Under Kentucky law, Plaintiffs have the burden of establishing that Defendant's allegedly defective design was the proximate cause of the fatal injuries, which "is defined by the substantial factor test: was [Defendant's] conduct a substantial factor in bringing about [Plaintiffs'] harm?"  *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995).  In other words, as Plaintiffs have conceded, "the plaintiff in a defective design action must produce evidence to 'justify a reasonable inference of probability rather than a mere possibility that the [alleged design defects] were responsible' for [the] injuries."  *Stewart v. General Motors Corp.*, 222 F. Supp. 2d 845, 848 (W.D. Ky. 2002) (quoting *Hersch v. United States*, 719 F.2d 873, 878 (6th Cir. 1983)).

Once again, there is a fundamental problem with Plaintiffs' case.  Because the allegedly wrongful injury in this action is death (i.e., wrongful death action), Plaintiffs must presumably show that death was not probable without the alleged defects.  However, Plaintiffs proffer no expert medical testimony as to the probability that the fatal head injuries suffered by the deceased were attributable to the allegedly defective design of the Jeep. In fact, Plaintiffs acknowledge the complete lack of any medical testimony, inexplicably arguing that such evidence is unnecessary.  According to Plaintiffs: "Defendant argues

-20-

plaintiff has not provided a medical doctor to testify that the pipe killed [the deceased], but plaintiff maintains this is squarely within the capabilities of a lay juror to comprehend."  In other words, Plaintiffs were apparently planning to rely solely on the autopsy photographs at trial in the mistaken assumption that the jury would be able to find causation absent any medical testimony to that effect.

Furthermore, while some non-medical experts have opined that Mr. Bigham's chances of survival would have been improved had the alleged defects and failures not taken place, not one expert has opined with a reasonable degree of medical certainty that Mr. Bigham would have survived but for the alleged design defects.  To the contrary, not only does this seem unlikely given the nature of the accident and the numerous additional injuries sustained by the deceased, but the testimony of the medical examiner, Dr. Stephens, suggests that there was a strong likelihood the deceased would have died regardless of the fatal head injuries.  Plaintiffs have offered no medical evidence to conclude otherwise.  As the Sixth Circuit explained in *O'Bryan,* it is never enough to establish a defect as only a *possible* cause:

> It is, of course, within the jury's province to determine which expert to believe.  Where expert testimony is supported by nothing more than conjecture and supposition, however, it is not entitled to be credited by the jury.  Hence, when the plaintiff's proof does not rise to the level of establishing that the alleged defect was the probable cause of the [injuries], but merely offers a possible cause in a series of possibilities, it is insufficient to establish liability.  Moreover, when alternate causes are presented that could have caused the plaintiff's injury, the burden is on the plaintiff to establish that the alleged defect is the probable, as opposed to a possible, cause.

1994 U.S. App. LEXIS 31348, at *11-12 (internal citations omitted).

-21-

Given the violent nature of the accident, it would be impossible and imprudent for the Court, and especially a lay juror, to blindly conclude that the deceased would not have died but for the defects and failures alleged by Plaintiffs. Medical evidence and expert testimony are essential to that effect, but Plaintiffs offer none. The only such evidence or testimony is from the medical examiner, which Plaintiffs attempt to characterize as favorable to their case: "There is testimony that aside from the his head injuries, Bigham *may* have still survived this accident assuming all other injuries remained the same" (emphasis added). Based on this *possibility* alone, Plaintiffs argue that causation has been established. Plaintiffs are mistaken. "Under Kentucky law, the plaintiff has the burden of establishing that the circumstances surrounding the accident were such as to justify a reasonable inference of probability, rather than a mere possibility, that the alleged design defects were responsible for the injuries." *Id.* at * 11 (citing *Hersch v. United States*, 719 F.2d 873, 878 (6th Cir. 1983).

In sum, while Plaintiffs' maintain that "the sole reason for the gouging fatal injuries inflicted by the broken pipe are the direct result of a defective sports bar and a defective restraint system," without any medical evidence to substantiate Plaintiffs' claim, this conclusion is mere conjecture. "Proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or seller's duty as to the design of the product."[10] *Jones*, 502 S.W.2d at 70. The dispositive question as to causation then is

---

[10] This level of proof is of even a more crucial nature in light of the accident's severity and the injuries, even apart from the head wounds, suffered by the deceased. As the Court emphasized in *McCoy*, the hurdles are high in these severe cases:

whether Plaintiffs have sufficiently shown, for purposes of surviving summary judgment, that the alleged design defects were substantial factors in causing the fatal head injuries suffered by the deceased to such an extent as to justify a reasonable inference of probability, rather than a mere possibility, that the alleged defects caused Mr. Bigham's death. The answer from all indications in the record is no.

## IV.   CONCLUSION

This is unquestionably a tragic case. The sheer ignorance and indifference shown by the driver that initially caused the accident, which then resulted in the untimely death of Mr. Bigham, cannot be overstated. However, tragedy does not always equal culpability or liability, and it does not so equate here. No matter how unfortunate the circumstances, when viewing the undisputed facts in a light most favorable to the non-moving party, Plaintiffs have simply failed to put forth any competent evidence as to an alternative design. Absent this identifiable alternative, Plaintiffs cannot and have not presented any evidence of what injuries would have befallen Mr. Bigham had alternative designs been utilized by Defendant. Furthermore, Plaintiffs have not proffered any medical testimony establishing that the alleged design defects were a substantial factor in the death of Mr. Bigham, especially in light of the accident's severity. Proof of causation in this case, therefore, has proven woefully inadequate.

_____

What the plaintiff fails to understand, however, is that it is incumbent upon her to show by competent evidence what her injuries would have been if the air bag had inflated. In other words, it may be the case that the plaintiff's accident was so severe that even if the air bag had inflated the plaintiff would have incurred the same or worse injuries than she received without the air bag inflating; thus, no causation and no damages would be present.

47 F. Supp. 2d at 840-41 (granting summary judgment for defendant in a crashworthiness case involving deployment of an air bag).

Put simply, it is never sufficient in enhanced injury cases to rely merely on the speculative and conclusory foundation upon which Plaintiffs now rely. In a crashworthiness claim, where the allegation surrounds an alleged failure by a vehicle to protect its occupant during a collision, not that a defect caused an accident, substantially more is necessary. This is especially true in cases, such as in the instant action, where the record supports a statutory presumption in favor of Defendant because the vehicle in question was compliant with all design and manufacturing safety standards. Finally, although the prima facie case for a crashworthiness claim is indeed a significant hurdle to overcome, it is a justifiable hurdle that ensures manufacturers are not held liable for accidents beyond their control without proof that the design utilized was indeed unreasonably dangerous to the consumer.

In accordance with the foregoing analysis, and in the absence of any genuine issues for trial, summary judgment is appropriate and Defendant must prevail as a matter of law. *See McCoy*, 47 F. Supp. 2d at 840 ("claims must be dismissed for failing to substantiate . . . the elements of [Plaintiffs'] prima facie case").

For the reasons set forth above, **IT IS ORDERED** that:

(1)     Defendant's Motion for Summary Judgment on All of Plaintiffs' Claims (Doc. # 21) be, and hereby is, **GRANTED**;

(2)     Defendant's Motion for Summary Judgment on Punitive Damages (Doc. # 23) be, and hereby is, **DENIED AS MOOT**;

(3)     Defendant's Motions for Hearings (Docs. # 24, 25) be, and hereby are, **DENIED AS MOOT**;

-24-

(4)     Plaintiffs' Complaint be, and hereby is, **DISMISSED WITH PREJUDICE** and

        **STRICKEN** from the active docket of this Court; and

(5)     A Judgment in favor of Defendant will be entered concurrently herewith.

This 16th day of November, 2006.



Signed By:

*David L. Bunning*

**United States District Judge**

G:\DATA\Opinions\2-05-048 Bigham (MSJ MOO).wpd

-25-